UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOSE TORREZ,

                Petitioner,                Case No. 1:05-cv-364

v.                                         Honorable Robert J. Jonker

KENNETH McKEE,

                Respondent.

_____/

### REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving one term of 20 to 45 years and a consecutive term of 2 years, imposed by the Ingham County Circuit Court on April 14, 1998, after a jury convicted Petitioner of assault with intent to commit murder, MICH. COMP. LAWS § 750.84, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. He also was convicted of assault with intent to commit great bodily harm, for which he was resentenced to a term of 4 to 10 years on November 21, 2001, after the Michigan Court of Appeals remanded the matter for resentencing. In his *pro se* petition, Petitioner raises nine grounds for relief, as follows:

I.      PETITIONER'S RIGHT TO PRESENT A DEFENSE WAS IMPROPERLY CURTAILED BY THE TRIAL COURT'S RULINGS EXCLUDING CRITICAL TESTIMONY RELEVANT TO HIS DEFENSE.

II.     PETITIONER WAS PREJUDICED WHERE HIS DEFENSE WAS THAT HE WAS PROTECTING HIS BROTHER FROM ATTACK, AND CALLED HIS BROTHER AS A WITNESS, BUT THE JUDGE REQUIRED THE BROTHER TO TESTIFY IN HANDCUFFS AND YELLOW JAIL UNIFORM.

III.    PETITIONER WAS DENIED DUE PROCESS WHERE ONE OR MORE JURORS WERE INTIMIDATED AND OUTSIDE INFORMATION WAS USED TO CONVICT.

IV.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL MISLED HIM AND CONCEALED INFORMATION ABOUT A PLEA BARGAIN.

V.    THE PROSECUTOR DENIED PETITIONER DUE PROCESS BY SUGGESTING TO THE JURY WITHOUT EVIDENCE THAT A DEFENSE WITNESS WAS A GANG MEMBER.

VI.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT OF ASSAULT WITH INTENT TO MURDER.

VII.    THE TRIAL COURT ACTED IMPROPERLY AND ABUSED ITS DISCRETION BY REFUSING TO ALLOW [PETITIONER] TO DISCHARGE HIS APPOINTED ATTORNEY.

VIII.    PETITIONER WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

IX.    PETITIONER WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.

Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied because they are either procedurally defaulted or have no merit. Upon review and applying the AEDPA standards, I find that all nine grounds are either procedurally defaulted and/or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from a shooting at the Silver Dollar Saloon in Ingham County. Petitioner, known as both Jose Torrez and Jaime Gonzalez, was charged with three counts of assault with intent to commit murder, one count of assault with intent to do great bodily harm less than murder, and one count of possession of a firearm during the commission of a felony. After a

preliminary examination held December 9 and December 12, 1997, Petitioner was bound over on one count of assault with intent to commit murder, one count of assault with intent to do great bodily harm less than murder, and one count of felony firearm. Petitioner was tried before a jury beginning March 3, 1998, and concluding on March 6, 1998.

Before jury selection began, defense counsel represented on the record that he had engaged in extensive discussions with his client on the preceding Friday, at the end of which he understood his client intended to accept a plea agreement and would plead guilty the following Tuesday, the opening day of trial. Petitioner disputed his attorney's representations, asserting that he had discussed going to trial and that he had requested his attorney file a variety of motions and obtain police reports. Specifically, he asked counsel to file a motion to quash the information and a motion for discovery. Petitioner further complained that he had not received the discovery and had just received a new document the morning of trial. (Tr. I, 4-5.) Counsel responded that the document handed to Petitioner was a newly amended information. The amended information was identical to the information at the time of bindover, with the exception of the additional Count VI, charging Petitioner as a habitual offender. (Tr. I, 8-9.) Defense counsel advised that he had seen all of the discovery in the case and that there was no basis for a motion to quash. (Tr. I, 5-6.) Counsel stated that he had asked his client what authority he had to settle the case and that his client had given him a "bottom line." Counsel had taken that bottom line to the prosecutor and had believed that he had a plea agreement. As a result, counsel had not prepared for trial over the weekend. Counsel further represented that there had been a complete breakdown in his relationship with his client. According to defense counsel, Petitioner was proceeding to trial against his advice and was asking the court for an adjournment. (Tr. I, 5-6.)

The trial court concluded that Petitioner was attempting to delay the trial and that defense counsel could adequately represent Petitioner. The court therefore denied an adjournment but stated that it would not force the trial forward without some time for preparation and the opportunity to subpoena witnesses. The court concluded, however, that the jury could be picked that day without prejudicing Petitioner. (Tr. I, 10-12.) Accordingly, the jury was picked on Tuesday, May 3, 1998. (Tr. I, 12-93.) Trial continued on Thursday, May 5, 1998.

At the time trial was scheduled to continue, defense counsel again advised the court that there had been a breakdown in his relationship with his client. He further represented that his client had since been arraigned in district court on four additional felony counts related to cocaine possession. Counsel requested a short adjournment to address certain new plea discussions and to resolve Petitioner's renewed interest in pleading guilty. (Tr. II, 100-01.) Counsel also represented that he lacked sufficient information to contact four of the witnesses identified by Petitioner that morning and therefore had not been able to prepare for their testimony. (Tr. II, 102-04.) The court rejected a request for brief adjournment, concluding that an hour delay would not resolve the issues and that Petitioner had failed to act responsibly following the Tuesday adjournment. (Tr. II, 105.)

The prosecution's first witness, Jason Byrd, testified that he worked a shift as backup to the bartender and bouncer or "floorman" at the Silver Dollar Saloon in Lansing, Michigan from 5:30 p.m. on November 27, 1997 to 3:00 a.m. on November 28, 1997. (Tr. II, 130-32.) Byrd stated that he was 5' 11" and weighed about 160 pounds. (Tr. II, 132.) According to Byrd, the bar has only one exit used by clients, located at the front of the bar. In the back, at the far left-hand corner of the bar, is a pool room. The bar also contains a stage. (Tr. II, 133.) The Silver Dollar, which has a capacity of 695 people, had at least 300 people in attendance on the night of November 27, 1997.

- 4 -

(Tr. II, 134.)  According to Byrd, he was behind the bar when a commotion began in the pool room in the early morning hours of November 28.  (Tr. II, 136.)  Byrd went toward the commotion and attempted to hold people back.  A couple of individuals attempted to get into the middle of the altercation, and another commotion  began near Byrd.  (Tr. II, 137.)  This second altercation involved Byrd, two other bouncers, and three customers.  One of those customers was Petitioner.  (Tr. II, 138.)  Another of the customers began to push Alan (Cryblsky), another bouncer.  As the customer got more violent, Cryblsky, Steve (Witzke) and Byrd asked the customer to leave.  Witzke and Byrd eventually came over and grabbed the customer by the arms and carried him outside.  (Tr. II, 141.)  The customer fought and kicked while being removed from the bar.  (Tr. II, 144.)  According to Byrd, no one tried to kill or hurt the customer during the minute-long altercation or when he was on the street, and no one held him around the neck.  (Tr. II, 141, 143, 145, 170.)  The customer was inebriated, but appeared to be alright, though he may not have been able to get up; he sat on the ground after being placed there.  (Tr. II, 144, 170.)

After the customer had been placed on the ground, Byrd stood right next to him.  A tall African-American man left the bar and began arguing with Cryblsky and Byrd.  The African-American man was loud and angry and swore at Cryblsky and Byrd, asking why his friend had been removed from the bar.  (Tr. II, 146-47.)  Cryblsky talked to the man, trying to calm him down.  Byrd turned back toward the front doors.  He saw Petitioner come out of the bar.  Petitioner walked up to Byrd and began to push him backwards, causing Byrd to trip over the man on the ground and lose his balance.  (Tr. II, 148.)  As he was being pushed, Byrd saw Petitioner reach to his left side with his right arm.  He became alarmed, believed that Petitioner was reaching for a weapon.  (Tr. II, 149.)  Byrd grabbed Petitioner, trying to control both of Petitioner's hands, and tried to pin him against the

wall or the window of the bar.  (Tr. II, 149-50.)  Someone was on Byrd's left side, but he could not

be sure who.  (Tr. II, 149.)  Petitioner began to slide down from the window, and Byrd began to lose

his grip.  Byrd heard two loud bangs, which he recognized as gunshots.  (Tr. II, 151-52.)  Byrd was

struck by a bullet on the outside of the left knee.  (Tr. II, 152-53.)

        After he was shot, Byrd went down on one knee and tried to figure out what had

happened and if he had really been shot.  He had not yet seen a weapon.  (Tr. II, 153.)  Byrd lost

sight of Petitioner.  He subsequently heard four or five more gunshots and saw Steve Witzke, on the

ground seven or eight feet to his left, trying to wrestle a small, silver gun from Petitioner's hand.

(Tr. II, 155-60.)  He saw Petitioner holding the gun and saw a flash from the end of the barrel.  (Tr.

II, 158-59.)  Byrd identified the handgun as People's Exhibit 3.  (Tr. II, 159-60.)  Steve Witzke had

his hand on Petitioner's arm at the time the shots were fired. (Tr. II, 162.)  At some point, Matt

Bramitt, another employee, removed the gun from Petitioner's hand.  (Tr. II, 163.)  After Bramitt

removed the gun, he walked toward a state trooper's car that was passing.  The officers approached

the scene.  (Tr. II, 163.)  Petitioner and Witzke were still struggling, and Byrd went to help control

Petitioner around the head.  (Tr. II, 164.)  Byrd never heard Petitioner make any statements about

saving his friend.  (Tr. II, 164.)

        Byrd was taken to Sparrow Hospital, where he spent two days.  He had surgery to

remove the bullet.  (Tr. II, 188.)  He then used crutches for six weeks and had two weeks of

rehabilitation.  (Tr. II, 165.)  Steve Witzke also was taken to the hospital in the same ambulance.

(Tr. II, 166.)

Byrd testified that he did not detect an odor of alcohol from Petitioner and never observed him to be stumbling or out of balance. Byrd was familiar with intoxicated people and did not observe Petitioner presenting intoxicated behaviors. (Tr. II, 166-67.)

Adam Cryblsky testified that he was 5' 5" and weighed 185 pounds. At the time of the incident, Cryblsky had worked as a bouncer at the Silver Dollar Saloon in Lansing for two years. On November 27, 1997, Cryblsky started work at 9:30 p.m. (Tr. II, 197-98.) Cryblsky testified that the bar was very busy when he started, with about 300 people in attendance. (Tr. II, 199.) A problem developed in the pool room at the bar in the early morning hours of November 28, 1997, and Cryblsky noticed other bouncers moving quickly toward the area. (Tr. II, 200.) Cryblsky left the stage and moved rapidly toward the commotion. (Tr. II, 201-02.) After he reached the pool room and verified things were under control, another altercation began just outside the pool room. (Tr. II, 202, 223.) According to Cryblsky, two other bouncers became involved with a Hispanic patron. (Tr. II, 202.) The patron began to be violent, pushing and shoving the bouncers as they attempted to escort him out. Cryblsky and the other bouncers grabbed the patron and dragged him out the front door. (Tr. II, 203.) Cryblsky held the individual around the arm and the head, in a reverse half nelson, and pulled him to the door. (Tr. II, 203-05.) It took about 20 seconds to drag the patron, as he was struggling against them. (Tr. II, 204.) The patron was taken to the cement slab in front of the restaurant. (Tr. II, 205.) Cryblsky testified that the patron was very drunk and had passed out shortly before reaching the door. Cryblsky made sure he was breathing and sat him up so that he would not choke if he vomited. (Tr. II, 206.) According to Cryblsky, the bouncers used minimum force, never struck the patron, and the hold used could not have choked the patron. (Tr. II, 206, 225.)

- 7 -

Once the patron had been placed on the ground, an African American customer came out of the bar and asked why they had choked the other man.  The bouncers told him that the other patron was fine and that he needed to be taken home.  The African American man said nothing more until a second Hispanic man, whom Cryblsky identified as Petitioner, came out of the bar.  (Tr. II, 208-209.)  The African American man pointed at Cryblsky and said, "This is the boy that choked your boy, this is the guy that choked your boy."  Cryblsky told both men that the other man was fine but very drunk, and needed to go home.  (Tr. II, 209.)  At this point, Petitioner began to reach inside his shirt and the belt area of his pants.  (Tr. II, 209-10.)  Cryblsky moved quickly toward Petitioner, trying to pin his arms.  Cryblsky feared that Petitioner had a firearm or a knife.  (Tr. II, 210-11.)  As the result of his physical contact with Petitioner, Petitioner was pushed up against the wall of the bar between the front door and the window.  (Tr. II, 211.)  Cryblsky had his head pressed into Petitioner's chest/neck area, and was holding him around the waist area, trying to pin both arms.  Petitioner was swinging at Cryblsky with his left elbow, and Cryblsky could not see what Petitioner was doing with his right hand.  Cryblsky was unaware of another person helping him at that time.  (Tr. II, 212-13.)

Cryblsky heard a loud crack or report of a firearm close behind him, to the left.  (Tr. II, 213.)  When he heard the shot, Cryblsky did not know if he had any other bouncer with him.  Because he was afraid of shots from behind, he ran toward the east and around the corner of the building.  (Tr. II, 214.)  As he was moving, he heard a second shot from about 20 feet away.  (Tr. II, 215.)  After he rounded the corner, he heard three more reports.  (Tr. II, 215.)  After no shots were fired for about 20 seconds, Cryblsky returned to the front of the Silver Dollar.  (Tr. II, 216.)  When he came back, two state troopers and several Silver Dollar employees, including Steven

- 8 -

Witzke, Jason Byrd, Matt, and Eric Joslyn, were surrounding Petitioner, who was face first, on the ground.  (Tr. II, 217.)  He saw a small, silver-plated pistol, which he guessed to be a .22 caliber, lying on the ground, within three to five feet of Petitioner.  (Tr. II, 217-18.)  Cryblsky identified People's Exhibit No. 3 as the handgun he saw.  (Tr. II, 218.)  Cryblsky had no personal knowledge as to whether Petitioner ever pointed the gun at Cryblsky's head.  (Tr. II, 219-20.)  According to Cryblsky, no ambulance was summoned or needed to take care of the patron who had been removed from the bar.  (Tr. II, 222.)

Steven Witzke testified that he had been employed at the Silver Dollar for a few weeks before November 27, 1997.  He testified he was 5' 7" tall and weighed about 150 pounds.  (Tr. II, 254.)  On the night of the incident, he was scheduled to work from 10:00 p.m. until closing.  (Tr. II, 254.)  The bar held about 200 to 300 people when he arrived.  (Tr. II, 255.)  Approximately eight to ten people worked as bouncers or floormen on any given night.  (Tr. II, 257.)  In the early morning hours, a group of Mexican American men began to argue in the pool room.  Witzke was standing near the pool room entrance.  (Tr. II, 258.)  Shortly before the pool room commotion, Witzke had cut off a man who had been drinking too much.  The man, who was with a group including Petitioner, had knocked over a table, and Witzke noticed that someone had vomited on the floor.  Witzke offered the man a chair, and the man tipped him.  (Tr. II, 259.)  When the pool room altercation began, people began moving closer to see what was happening.  (Tr. II, 259.)  As Witzke was facing the pool room, another altercation began just behind him, involving the man Witzke had cut off.  Alan Cryblsky began to drag the man out, with the assistance of Jason Byrd.  Witzke then helped Cryblsky and Byrd to carry the struggling man out.  (Tr. II, 260.)

Once they got the man outside, they sat him down on the concrete area in front of the bar. The man had passed out, and the bouncers sat him up. (Tr. II, 261.) They checked to make sure he was breathing and not in distress. (Tr. II, 261-63.) A tall, African American man came out of the bar and began to argue with Alan Cryblsky about the fact that the bouncers had dragged his friend out of the bar. Witzke did not pay a great deal of attention, as he was holding on to the drunk patron to be sure he did not fall over. (Tr. II, 264.) A second man came out of the bar, whom Witzke identified as Petitioner. After less than a minute, Witzke saw pushing and shoving between Petitioner and the other bouncers, leading to Petitioner being pushed toward the east side of the bar, in front of the window. (Tr. II, 266.) He heard two shots. (Tr. II, 268-69.) He saw Cryblsky crouching or kneeling next to someone else. (Tr. II, 292.) Witzke saw Petitioner run over and point a small, silver pistol at Cryblsky's temple. (Tr. II, 269, 277, 291, 293-94.) Witzke ran over, grabbed Petitioner with both hands by the gun arm, and pulled the gun away from Cryblsky's head. (Tr. II, 269, 271.) Witzke pointed the gun arm up in the air. Petitioner was pushing the gun toward Witzke's midsection. (Tr. II, 269, 272.) Witzke struggled with Petitioner for a minute-and-a-half to push the gun away from his midsection. (Tr. II, 271.) During that time, Petitioner at no time complained about his friend. (Tr. II, 271.) As Witzke struggled to push the gun away, Petitioner fired the gun twice, entering Witzke's wrist and exiting on the upper left side of his forearm. (Tr. II, 273-74.) Witzke then pinned Petitioner's hands so that he could not bend his arm. Matt Bramitt came to Petitioner's other side and grabbed Petitioner's arm. Witzke then noticed Petitioner's hand was empty. (Tr. II, 274-75.) Witzke asked Bramitt if the gun was down. (Tr. II, 275, 279.) He took one of Petitioner's arms and pinned it back. (Tr. II, 279.) Jason Byrd came back and grabbed Petitioner around the head. (Tr. II, 279.) Matt Bramitt saw there was a state trooper passing and

- 10 -

flagged him down.  (Tr. II, 279.)  The state troopers approached and took control of Petitioner.  (Tr. II, 280.)  Witzke identified People's Exhibit 3 as resembling the gun he saw in Petitioner's hand. (Tr. II, 277.)  According to Witzke, during the entire time Petitioner was outside the bar, Petitioner never complained of the bouncers' treatment of the other patron who had been removed from the bar.  (Tr. II, 281.)  He also denied seeing Cryblsky tackle Petitioner or attempt to hold him.  (Tr. II, 300.)

Witzke was taken to Sparrow Hospital in an ambulance, where he remained for four or five days.  He had immediate surgery, and he returned for follow-up care on four occasions.  He also saw a rehabilitation therapist to regain extension and mobility in his hand and arm.  (Tr. 283-84.)

Michigan State Police Trooper Jason Williams testified that on the early morning of November 28, 1997, he and his partner, Trooper Belt, were traveling in their cruiser along Michigan Avenue, past the Silver Dollar Saloon and toward East Lansing.  (Tr. II, 308-09.)  Williams saw what looked like a fight outside the Saloon, and a person appeared to be trying to flag the officers down.  The troopers parked in the lot on the east side of the Silver Dollar.  They observed several people wresting in front of the front door.  As they approached, a man came up to Trooper Belt and introduced himself as the manager of the Silver Dollar.  (Tr. II, 314.)  He told the officers that Petitioner had shot two of his employees.  (Tr. II, 314.)  The man handed Trooper Belt what looked like a small handgun.  (Tr. II, 310-11.)  Trooper Belt put the handgun in his belt.  (Tr. II, 312.)

Trooper Williams ran over to the three individuals wrestling on the ground.  One man was on the ground and two men were on top of him.  (Tr. II, 312-13.)  Williams tried to secure Petitioner's hands with handcuffs, but Petitioner resisted.  Williams struck Petitioner in the back of the thigh in the area of the common perineal nerve in an effort to distract him from resisting.  (Tr.

- 11 -

II, 314.)  Petitioner continued to resist.  (Tr. II, 314.)  Williams then used his pepper spray to subdue Petitioner so that he was able to handcuff him.  (Tr. II, 315-16.)  Because Petitioner continued to try to fight and kick, Williams further restrained him by tying his legs to his hands with a rope in a "Welch hitch."  (Tr. II, 316.)  The officers took Petitioner into custody and carried him to the back seat of the vehicle.  (Tr. II, 313, 317.)  According to Williams, Petitioner did not appear to be drunk at the time of the arrest.  (Tr. II, 323-34.)

Trooper Williams identified People's Exhibit 3 as a .22 caliber long rifle semi-automatic that held a total of 11 rounds.  (Tr. II, 317-19.)  He testified that the pistol could kill someone.  (Tr. II, 319.)

Michigan State Police Trooper Christopher Belt testified that, during the early morning hours of November 28, 1997, he and his partner, Trooper Jason Williams, were on routine patrol when they saw two people running toward them, waving their arms, from the front of the saloon.  (Tr. II, 328-29.)  They also saw several people rolling around on the ground, in an apparent fight.  The troopers parked in a lot on the southeast corner of the building.  (Tr. II, 329.)  As they were preparing to move toward the fight, they were approached by a man who identified himself as the manager of the Silver Dollar Saloon.  The man handed them a small chrome, silver, semi-automatic handgun.  (Tr. II, 330.)  Belt identified People's Exhibit 3 as a pistol identical with the one given him at the scene.  (Tr. II, 331.)  The manager told Belt that two of his bouncers had been shot and that the handgun was the one used in the shooting.  Belt placed the gun between his belt and his body.  (Tr. II, 331.)  He eventually turned the weapon over to Sergeant Tom Wright of the Lansing City Police Department.  (Tr. II, 332.)

- 12 -

When Belt was handed the gun, Trooper Williams went to the area of the fight, while Belt returned to the police cruiser to summon the Lansing Police Department and medical assistance. (Tr. II, 333.)  After making his call, he went to the area where Williams was attempting to secure Petitioner on the ground.  (Tr. II, 334, 337.)  Belt assisted Williams in using the Welch hitch to secure Petitioner's hands to his feet.  (Tr. II, 346.)  Belt was approached by another individual who told him that there was a second person in the foyer of the saloon whom they were trying to detain. (Tr. II, 334.)  Belt went to secure that person, Victor Gonzales.[1]  When he reached the foyer, Gonzales was lying on his stomach with his hands underneath him, and a bouncer was kneeling on him.  (Tr. II, 334-35.)  Because he had been informed that there had been a double shooting and that Victor Gonzales was involved, Belt attempted to handcuff Gonzales in order to secure him for further investigation.  (Tr. II, 335.)  Gonzales was conscious, but he would not respond to requests to put his hands behind his back.  (Tr. II, 335.)  After trying techniques to get Gonzales to cooperate, and because he was not certain if Gonzales had a weapon under him, Belt used chemical spray to obtain cooperation.  He then handcuffed Gonzales.  (Tr. II, 336.)

Belt and Williams brought Petitioner to the jail.  (Tr. II, 338, 347-48.)  At that time, Petitioner was not stumbling and appeared to have his faculties about him.  (Tr. II, 339.)  His speech was somewhat altered by the pepper spray.  (Tr. II, 339, 351.)  Petitioner, however, remained uncooperative.  (Tr. II, 339.)  He was combative during the search of his person, and Belt and Williams assisted jail personnel to restrain him.  (Tr. II, 348-49.)

---

[1]The trial transcripts reflect that Petitioner's brother's name was spelled "Gonzales."  In various other portions of the record, Victor's name was spelled "Gonzalez."  For consistency during this report and recommendation, I have used "Gonzales" throughout, except when quoting from pleadings containing the other spelling.

Lansing Police Detective Dominic Marcantonio was one of the officers who responded to Belt's call on November 28, 1997. (Tr. II, 355.) He arrived at approximately 1:30 a.m. (Tr. II, 355.) Marcantonio identified People's Exhibit 3 as the Jennings .22 caliber pistol he received from Sergeant Wright that night. Marcantonio eventually secured the handgun at the Lansing jail. (Tr. II, 356.) Among other things, Marcantonio talked to a number of witnesses and made sure the victims were alright. He placed Jason Byrd in his vehicle until the ambulance arrived. (Tr. II, 358.) Marcantonio attempted unsuccessfully to talk with Petitioner that evening. (Tr. II, 360.)

At the opening of the third day of trial, Petitioner blurted out before the jury that his attorney had told him he was unable to win the case and that he deserved a fair trial and fair defense. (Tr. III, 372.) After excusing the jury, the court heard Petitioner's complaint that his attorney had no interest in the case, that he did not believe he could win, and that he had failed to call witnesses. Defense counsel moved for a mistrial on the basis of Petitioner's outburst before the jury. (Tr. III, 373-75.) The court denied the motion for mistrial and found that Petitioner had raised frivolous complaints. (Tr. III, 376.) Petitioner was given the choice of refraining from further outbursts or being gagged or removed from the courtroom. (Tr. III, 376.) Defense counsel renewed his argument that there had been a breakdown in the relationship between defense counsel and Petitioner. (Tr. III, 375.) Petitioner made additional representations about counsel's failure to call witnesses related to the death of Rex Bell at the hands of Sparky's bouncers, which counsel disputed. (Tr. III, 382-83.) The court rejected Petitioner's objections about the Rex Bell witnesses on the grounds that they were frivolous. (Tr. III, 384.) Defense counsel asked the court to inquire, in the face of Petitioner's position, whether Petitioner wished to represent himself with counsel

serving as an advisor. (Tr. III, 385.) Petitioner declined to represent himself but again requested a new attorney. (Tr. III, 386.) The court denied the motion for change of counsel. (Tr. III, 386.)

The parties stipulated that numerous police and civilian witnesses would not need to be called. (Tr. III, 387.) The prosecution then called Dr. Ben Bachulis, the Trauma Director at Sparrow Hospital. (Tr. III, 388-89.) Bachulis testified that he was part of the trauma team that treated Jason Byrd and Steve Witzke on November 28, 1997. (Tr. III, 390-91.) Bachulis testified that each had sustained a single gunshot wound. (Tr. III, 391.) One bullet struck Jason Byrd on the outside lateral aspect of the left knee and lodged within the knee joint. (Tr. III, 392.) Dr. Dodd removed the bullet with an arthroscope. (Tr. III, 392.) Bachulis testified that the injury was serious and painful, and, had the bullet not been removed promptly, could have lead to lead poisoning from its location in the joint fluid. (Tr. III, 393.)

Steven Witzke's injury was potentially more serious. He immediately developed compartment syndrome, in which the muscle in the injured area swelled within the connective tissue, causing high pressure that inhibited the ability of blood to reach the area. Dr. Dodd took Witzke to surgery immediately to relieve the pressure. (Tr. III, 394-95.) The surgery opened the connective tissue to allow the muscle to expand and reduce pressure. (Tr. III, 395.) Without treatment, Witzke would have lost his forearm. (Tr. III, 396.) Bachulis testified that Witzke had powder burns on his arm, indicating that the weapon was very close. (Tr. III, 398-99.) Both Byrd and Witzke were given morphine for pain. (Tr. III, 397.) Neither injury was immediately life-threatening. (Tr. III, 398.)

Lansing Police Officer Lauren DeYoung was a crime scene investigator at the scene. (Tr. III, 400-01.) DeYoung testified that she arrived at approximately 1:50 a.m., and that yellow crime scene tape already had been stretched across the area. (Tr. III, 402.) She identified a series

of photographs in evidence as those she had taken.  (Tr. III, 402.)  Exhibit 1C showed a bullet hole

in the exterior wall of the saloon, just to the side of the window.  (Tr. III, 403.)  DeYoung testified

that two cartridge casings were picked up near the front door of the saloon, one on the cement slab,

one on the wood planked sidewalk.  (Tr. III, 405, 408, 410.)  DeYoung explained that small cartridge

casings could be difficult to find, especially where people have been wrestling on the ground,

possibly driving the shell into the ground.  (Tr. III, 406.)  DeYoung looked for additional cartridge

casings in the grassy areas to the side of the sidewalk near the front door.  She did not find any

others.  (Tr. III, 418.)

Sergeant Thomas Wright of the Lansing Police Department, together with Officer

Longoria, were the first unit to respond to Trooper Belt's call for assistance.  When Wright arrived,

Belt handed him a Jennings .22 caliber small chrome semi-automatic handgun.  (Tr. III, 421-22.)

After receiving the handgun, Wright checked to make sure it was unloaded.  He found no rounds in

either the clip or the chamber.  (Tr. III, 422-23.)  The gun had mud on it when it was handed to

Wright.  (Tr. III, 425.)  At the close of Wright's testimony, the prosecution rested.  (Tr. III, 426.)

Defense counsel moved for directed verdict on the offenses of assault with intent to

murder and assault with intent to commit great bodily harm less than murder.  (Tr. III, 428.)  The

court denied the motion.  (Tr. III, 430-31.)  Petitioner made a number of representations to the court

concerning new witnesses he had located and his desire to use the police videotape of his lack of

cooperation at the jail, which he believed showed that he was intoxicated.  (Tr. III, 432.)  After

opportunities for counsel to interview the new witnesses and the videotape, counsel represented that

he would be calling two witnesses, neither of whom was raised by Petitioner that morning.  Counsel

also represented that he would not use the tape, as it showed Petitioner strenuously resisting five or

six officers and included no sound that would indicate the state of Petitioner's intoxication.  (Tr. III, 433.)  The court expressed agreement about the potential prejudice of the tape.  (Tr. III, 435.)  Petitioner, however, insisted the tape be shown, and counsel agreed to show it, over his own recommendation.  (Tr. III, 436.)  Petitioner again sought to present the testimony of a witness relating to the Rex Bell incident, which the court again declined to allow.  (Tr. III, 437.)

   Petitioner's brother, Victor Gonzales, testified that he was at the house of his cousin, Bonnie Gonzales, during the late afternoon and evening of November 27, 1997, together with Petitioner, Fernando Gonzales, and Johny Buck.  (Tr. III, 439, 457-59.)  Victor testified that they all were drinking at his cousin's house.  Petitioner drank both beer and cognac and had quite a few drinks.  (Tr. III, 439-40, 463.)  Sometime between 10:30 p.m. and midnight, Victor, Petitioner, Johny Buck, Fernando Gonzales and Jerry Gonzales all went to the Silver Dollar Saloon.  (Tr. III, 440.)  Victor testified that he was very intoxicated and did not remember the night very clearly.  (Tr. III, 440-41.)  Nevertheless, Victor was aware that Petitioner also was intoxicated.  (Tr. III, 441.)  When the altercation began in the bar, Victor attempted to go over and break it up.  He was grabbed by two of the bouncers.  (Tr. III, 441.)  One of them held him in a head lock, and they escorted him out of the bar.  According to Victor, he did not resist.  (Tr. III, 441-42.)  Victor eventually lost consciousness and woke up outside the bar after the police were around.  (Tr. III, 442.)  He did not remember anything else about the incidents of the evening.  (Tr. III, 443.)  Victor acknowledged that he did not have any injuries as the result of being carried out of the bar and that he sought no medical treatment.  (Tr. III, 469-70.)

   At this time, defense counsel attempted to question Victor about his knowledge of Petitioner's friend, Rex Bell, having died while being handled by bouncers.  The prosecution

objected, and the court excused the jury to take an offer of proof.  (Tr. III, 443-44.)  Outside the

presence of the jury, Victor testified that Petitioner had mentioned his concerns about what had

happened to Rex Bell.  (Tr. III, 444.)  Petitioner had told Victor that Rex Bell had died because

bouncers had grabbed him and strangled him.  (Tr. III, 446.)  The prosecutor cross-examined Victor,

establishing that Rex Bell's death occurred more than three years before the time of trial.  (Tr. III,

447.)  Defense counsel also called John Buck on the offer of proof.  Buck testified that he had

known Petitioner over ten years.  He was aware that Petitioner and Rex Bell had grown up together.

(Tr. III, 448-49.)  He had heard Petitioner talk about the death and his anger and concerns about

Bell's death.  (Tr. III, 450.)  Buck testified that, on the night of the incident at the Silver Dollar, he

was present and became concerned about the manner in which Victor Gonzales was removed from

the bar.  (Tr. III, 450.)  He did not know if Petitioner saw Victor being removed, but Buck told

Petitioner, "[T]hey are hurting your brother."  (Tr. III, 451.)  Buck could not testify as to Petitioner's

reaction.  (Tr. III, 451.)  The court heard argument about the admissibility of the testimony about

Rex Bell.  (Tr. III, 451-53.)  Following the offer of proof, the court determined that the testimony

could be marginally relevant to the reasonableness of Petitioner's belief that his brother was in

danger.  Nevertheless, the court held that the minimal relevance was substantially outweighed by

the danger of prejudice and confusion.  (Tr. III, 453-54.)

Before the jury was returned, Petitioner personally objected to the fact that his brother

was being forced to testify while handcuffed, which he argued was prejudicial.  (Tr. III, 454-55.)

The court ruled that Victor Gonzales would remain in handcuffs, but an appropriate instruction

would be given.  (Tr. III, 455.)  After the instruction was given, Victor Gonzales resumed his

testimony, stating that he had no memory of any event of the evening after waking on the sidewalk. (Tr. III, 456.)

John Buck testified that he grew up with Petitioner and had known him for more than ten years.  (Tr. III, 471-72.)  Buck testified that, in the early evening of November 27, 1997, he brought a case of beer and a fifth of cognac to the home of Bonnie Gonzales, Petitioner's cousin, where Buck, Petitioner and Victor Gonzales were part of a group of about ten people.  (Tr. III, 472-73, 486.)  Petitioner drank beer and cognac until about 10:00 p.m., when the group went to the Silver Dollar Saloon.  (Tr. III, 473-74.)  According to Buck, both Victor and Petitioner were intoxicated, though Buck was not.  (Tr. III, 474-75.)  Buck could not say, however, how much Petitioner had been drinking.  (Tr. III, 486.)  They traveled to the bar in multiple vehicles.  (Tr. III, 474, 486.)  When Buck arrived, both Victor and Petitioner were drinking shots of tequila.  (Tr. III, 474-75.)  Sometime after 11:00 p.m., Victor threw up on the table.  Eventually, two bouncers carried Victor out of the bar by his neck, belt and arms.  (Tr. III, 475.)  Buck testified that Victor was passed out and that he was concerned that the bouncers had choked him too hard.  (Tr. III, 475-76.)  Buck saw that the bouncers had Victor by the neck and that they continued to restrain him by the neck once they had him outside.  (Tr. III, 478.)  Buck screamed at the bouncers and told them to get off of Victor's neck.  He tried to pull one bouncer off Victor.  (Tr. III, 478.)  When Petitioner came out of the bar, Buck told Petitioner that they would not get off Victor and were continuing to rough him up.  (Tr. III, 479.)  Buck heard scuffling from behind him and heard more than two and perhaps as many as seven gunshots, but his attention was focused on Victor.  (Tr. III, 479, 480.)  On cross-examination, the prosecutor asked Buck, "Do you have a tattoo from a gang?"  Buck answered,

- 19 -

"That's not gang colors or tattoos for one, no."  The prosecutor repeated, "You're sure?" Buck responded, "Positive."  (Tr. III, 483.)

At the conclusion of Buck's testimony, the jury was dismissed briefly.  Petitioner repeated his assertion that his attorney was not representing him properly, and he requested a new attorney five additional times.  (Tr. III, 502-05, 509, 511, 512, 514.)  The court denied the motion five more times.  (Tr. III, 506, 510, 511, 513, 514.)  Petitioner expressed his intention to exercise his right to remain silent.  (Tr. III, 514.)  On examination by counsel, Petitioner represented that his decision whether to testify would have been different had he been given a new attorney.  (Tr. III, 515.)  Defense counsel moved for an adjournment to obtain co-counsel so that Petitioner could testify.  (Tr. III, 515.)  The court denied the motion  (Tr. III, 516.)  After further colloquy, the court determined that Petitioner had voluntarily exercised his right to remain silent.  (Tr. III, 518.)

In accordance with Petitioner's express request and against the advice of counsel, the defense played the videotape of Petitioner struggling with officers at the jail.  (Tr. III, 520.)  The defense rested.  (Tr. III, 521.)

The prosecutor recalled Detective Marcantonio to testify that the videotape played by defense counsel was recorded at the detention center of the City of Lansing jail.  (Tr. III, 524.)  Marcantonio also testified about the restraint techniques used on Petitioner, as recorded on the videotape.  (Tr. III, 524-25.)  The prosecution concluded rebuttal. (Tr. III, 526-27.)

At the conclusion of trial, on March 6, 1998, the jury found Petitioner guilty of all three counts.  (Tr. III, 581-82, docket #21.)  On April 1, 1998, Petitioner filed a motion for mistrial based on the representations of one juror that she was pressured by the foreperson and other members of the jury to disregard instructions regarding the intent necessary to prove assault with

intent to commit murder.  After a hearing, the court denied the motion.  On April 14, 1998, Petitioner was sentenced to serve terms of 20 to 45 years on the charge of assault with intent to murder, 160 months to 20 years on the charge of assault with intent to do great bodily harm, and two consecutive years on the felony-firearm charge.  (Sentencing Transcript, ("S. Tr."), 10-11, docket #23.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  He filed a notice of appeal on May 5, 1998.  On October 14, 1998, he filed a motion for new trial.  Petitioner argued that he had been prejudiced by his brother being forced to testify in jail garb and handcuffs.  He further argued that the trial court had erred in precluding the introduction of evidence of the death of Rex Bell to demonstrate Petitioner's state of mind.  The court held an evidentiary hearing on November 13, 1998, and an order denying the motion was entered on December 1, 1998.  (Cir. Ct. Docket Sheet at 6, docket #17.)

Counsel for Petitioner filed an appellate brief on February 24, 1999, raising the following five issues:

I.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S REFUSAL TO ALLOW DEFENDANT TO PRESENT EVIDENCE REGARDING HIS KNOWLEDGE OF THE MANNER IN WHICH REX BELL DIED?

II.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S DECISION ALLOWING VICTOR GONZALEZ, DEFENDANT'S BROTHER, TO TESTIFY IN HANDCUFFS AND THE FAILURE OF DEFENDANT'S ATTORNEY TO OBJECT?

III.  DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON HIS CLAIM

THAT HIS ATTORNEY ERRED BY FAILING TO OBJECT TO WITNESS VICTOR GONZALEZ' APPEARING IN JAIL CLOTHES?

IV.     DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COERCION OF A JUROR BY THE JURY'S FOREMAN WHO URGED THE JUROR NOT TO FOLLOW THE COURT'S INSTRUCTIONS?

V.      DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S REQUEST FOR THE APPOINTMENT OF A NEW ATTORNEY OR FOR A CONTINUANCE SO DEFENDANT'S FAMILY COULD RETAIN A SUBSTITUTE ATTORNEY?

(See Def.-Appellant's Br. on Appeal, docket #26.)   Petitioner filed a pro per supplemental brief

raising three issues:

I.      SHOULD DEFENDANT'S CONVICTIONS BE REVERSED AS VIOLATIVE OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, WHERE THE COURT ERRED IN FINDING THE PROSECUTION'S EVIDENCE SUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THE INTENT NECESSARY TO COMMIT THE CRIMES CHARGED?

II.     SHOULD DEFENDANT'S HABITUALIZED SENTENCES BE VACATED AS VIOLATIVE OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, WHERE THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE PROSECUTION TO FILE AMENDED INFORMATIONS TO HABITUALIZE HIS SENTENCES AFTER THE ALLOWED TIME FOR FILING HAD EXPIRED?

III.    SHOULD DEFENDANT'S CONVICTIONS BE REVERSED AS VIOLATIVE OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, WHERE HIS TRIAL COUNSEL COMMITTED SERIOUS ERRORS IN: A) FAILING TO INVESTIGATE AND ASSERT A VIABLE DURESS DEFENSE, B) FAILING TO MOTION FOR DISCOVERY, C) FAILING TO PROPERLY ADVISE CLIENT OF HIS RIGHT TO TESTIFY, AND D) FAILING TO OBJECT TO IMPROPER PROSECUTOR REMARKS?

(Def.-Appellant's Supp. Br. on App., docket #26.) Petitioner filed a motion to remand on December

10, 1999, which was denied by the Michigan Court of Appeals on December 26, 2000.   (See

- 22 -

12/26/00 Mich. Ct. App. Ord., docket #26.)  By unpublished opinion issued on December 26, 2000,

the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's

convictions, but vacated the sentence for assault with intent to commit great bodily harm, remanded

for resentencing, and dismissed the supplemental information charging Petitioner as a habitual

offender.  (See 12/26/00 Mich. Ct. App. Opinion ("MCOA Op."), docket #26.)

        Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court on February 20, 2001.  Petitioner initially raised the following seven claims raised before and

rejected by the Michigan Court of Appeals:

> I.      DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S REFUSAL TO ALLOW THE DEFENDANT TO PRESENT EVIDENCE REGARDING HIS KNOWLEDGE OF THE MANNER IN[] WHICH REX BELL DIED.

> II.     DID THE TRIAL COURT CREATE A REVERSIBLE ERROR BY ABUSING ITS DISCRETION BY CONVICTING THE DEFENDANT W[H]ERE THERE WAS INSUFFICIENT EVIDENCE SUPPORTING THE CONVICTION AGAINST THE GREAT WEIGHT OF THE EVIDENCE BEYOND A REASONABLE DOUBT TO JUSTIFY A GUILTY VERDICT.

> III.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING THE DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COURT'S DECISION ALLOWING VICTOR GONZALEZ, DEFENDANT'S BROTHER TO TESTIFY IN HANDCUFFS AND THE FAILURE OF THE DEFENDANT'S ATTORNEY TO OBJECT.

> IV.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING THE DEFENDANT'S MOTION FOR NEW TRIAL BASED ON THE COERCION OF A JUROR BY THE JURY'S FOREMAN WHO URGED THE JUROR NOT TO FOLLOW THE COURT'S INSTRUCTIONS.

> V.     THE COURT ABUSED ITS DISCRETION BY ALLOWING THE PROSECUTION TO FILE A[]MENDED INFORMATION CHARGING THE DEFENDANT AS AN HABITUAL OFFENDER AFTER 21 DAYS AFTER THE DEFENDANT'S ARR[A]IGNMENT ON THE INFORMATION CHARGING THE UNDERLYING OFFENSE.

- 23 -

VI.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING
      DEFENDANT'S REQUEST FOR THE APPOINTMENT OF A NEW
      ATTORNEY FOR A CONTINUANCE SO THE DEFENDANT'S FAMILY
      COULD RETAIN A SUBSTITUTE ATTORNEY.

VII.  THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL
      COUNSEL WHICH VIOLATED HIS CONSTITUTIONAL RIGHT.

(Def.-Appellant App. for Lv. to Appeal, docket #27.)  Petitioner subsequently sought leave to add

two additional grounds for appeal:

I.    THE COURT OF APPEALS ERRED IN REFUSING TO REMAND
      DEFENDANT'S SENTENCE OF ATTEMPTED MURDER AFTER THE
      COURT OF APPEALS VACATED THE AMENDED INFORMATION
      FOR FAILURE OF PROSECUTOR TO FILE INFORMATION WITHIN 21
      DAYS CHARGING THE DEFENDANT AS AN HABITUAL OFFENDER.

II.   THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING
      DEFENDANT'S MOTION FOR NEW TRIAL BASED ON HIS CLAIM
      THAT HIS ATTORNEY ERRED BY FAILING TO OBJECT TO
      WITNESS VICTOR GONZALEZ' APPEARING IN JAIL CLOTH[E]S.

(Def.-Appellant's Mot. to Add Additional Grounds for Appeal, docket #27.)  By order entered

September 21, 2001, the Michigan Supreme Court granted Petitioner's motion to add grounds for

appeal but denied his application for leave to appeal because it was not persuaded that the questions

presented should be reviewed.  (See 9/25/01 Mich. Ord., docket #27.)

On November 21, 2001, the trial court on remand held a new sentencing hearing and

resentenced Petitioner on the assault with intent to commit great bodily harm less than murder to a

term of 4 to 10 years of imprisonment.  (Trial Court Docket Sheet, docket #17.)  Petitioner again

appealed, seeking remand to address new or newly federalized claims about the validity of his

underlying convictions.  The prosecutor filed a motion to dismiss the appeal on the grounds that the

claims presented in a second appeal following resentencing were limited to errors involving the new

- 24 -

sentence.  The court of appeals granted the motion to dismiss on November 15, 2002.  (11/15/02

MCOA Ord., docket #28.)  Petitioner did not seek leave to appeal to the Michigan Supreme Court.

### C.     Post-conviction relief

On June 20, 2003, Petitioner filed a motion for relief from judgment in the Ingham

County Circuit Court, raising ten claims:

I.     WAS DEFENDANT DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL WHERE HIS TRIAL ATTORNEY FAILED TO,
A) PROPERLY CONVEY AND REQUEST A SPECIFIC PERFORMANCE
OF THE PLEA AGREEMENT MADE BY THE PROSECUTION,
B) FAILED TO INTERVIEW DEFENSE WITNESSES, C) FAILED TO
PRESENT AND ASSERT AN INTOXICATION DEFENSE, D) FAILED
TO SECURE AN EXPERT WITNESS FOR DEFENDANT'S DEFENSE,
AND, E) WHERE TRIAL COUNSEL FAILED TO MAKE TIMELY
OBJECTIONS TO REPEATED PROSECUTORIAL MISCONDUCT?

II.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL
WHERE THE PROSECUTION ENGAGED IN PROSECUTORIAL
MISCONDUCT BY SUGGESTING TO THE JURY THAT A KEY
DEFENSE WITNESS WAS IN A GANG AND HAD GANG TATTOOS?

III.   WAS DEFENDANT DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL
WHERE THE TRIAL COURT REVERSIBLY ERRED BY DENYING THE
DEFENSE MOTION FOR A DIRECTED VERDICT ON THE CHARGE
OF ASSAULT WITH THE INTENT TO MURDER, WHERE THE
PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT
EVIDENCE ON THE ESSENTIAL ELEMENT OF THE INTENT TO
TAKE A LIFE?

IV.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL
CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL
WHERE THE CUMULATIVE EFFECT OF ALL TRIAL COURT ERRORS
DENIED DEFENDANT TORREZ A FUNDAMENTALLY FAIR TRIAL?

V.     WAS DEFENDANT TORREZ DENIED HIS STATE AND FEDERAL
RIGHTS TO THE EFFECTIVE ASSISTANCE OF APPELLATE

COUNSEL WHERE COUNSEL NEGLECTED TO RAISE ON DIRECT REVIEW THE ABOVE CONSTITUTIONAL VIOLATIONS?

VI.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND A FAIR TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON THE COURT'S REFUSAL TO ALLOW DEFENDANT TO PRESENT EVIDENCE REGARDING HIS KNOWLEDGE OF THE MANNER IN WHICH REX BELL DIED?

VII.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND A FAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON THE COURT'S DECISION ALLOWING VICTOR GONZALEZ, DEFENDANT'S BROTHER, TO TESTIFY IN HANDCUFFS AND A YELLOW COUNTY JAIL JUMPSUIT, AND THE FAILURE OF DEFENDANT'S ATTORNEY TO OBJECT?

VIII.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND A FAIR TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL, BASED ON HIS CLAIM THAT HIS TRIAL ATTORNEY WAS INEFFECTIVE FOR FAILING TO OBJECT TO DEFENSE WITNESS VICTOR GONZALEZ APPEARING IN JAIL CLOTHES?

IX.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND A FAIR TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL, BASED ON THE COERCION OF A JUROR NOT TO FOLLOW THE COURT'S INSTRUCTIONS?

X.    WAS DEFENDANT DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND A FAIR TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S REQUEST FOR THE APPOINTMENT OF A NEW TRIAL ATTORNEY, OR FOR A CONTINUANCE SO DEFENDANT'S FAMILY COULD RETAIN A SUBSTITUTE ATTORNEY?

(Def's Mot. for Relief from J., docket #30.)  The trial court denied the motion on November 13, 2003, on the grounds that Petitioner had failed to meet the requirements of MICH. CT. R. 6.508(D)(2), as the claims previously had been raised and decided against Petitioner on direct appeal.  (11/13/03 Ord., docket #30.)  The court denied Petitioner's motion for reconsideration on January 9, 2004.  (1/9/04 Cir. Ct. Ord., docket #31.)

Petitioner sought leave to appeal to the Michigan Court of Appeals, raising the same ten issues raised in his motion for relief from judgment in the circuit court.  The court of appeals denied leave to appeal on July 15, 2004, for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (7/15/04 MCOA Ord., docket #30.)  Petitioner filed an application for leave to appeal to the Michigan Supreme Court, which was denied on December 29, 2004, on the basis of MICH. CT. R. 6.508(D).  (12/29/04 MSC Ord., docket #31.)  Petitioner filed the instant habeas petition on May 23, 2005.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).        A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

### I.   Ground 1:  Right to Present a Defense

In his first ground for habeas relief, Petitioner asserts that he was denied his right to present a defense when the trial court excluded evidence regarding the death of his friend, Rex Bell, at the hands of bouncers at an area bar.  Petitioner contends that such evidence was critical to the jury's understanding of his state of mind, which itself was relevant both to the intent necessary to support the offenses of assault with intent to commit murder and assault with intent to commit great bodily harm and to his defense of self-defense.

Respondent asserts that Petitioner's first habeas ground is procedurally defaulted. Petitioner's claim was not raised in his direct appeal to either the Michigan Court of Appeals or the Michigan Supreme Court.  On direct appeal to those courts, Petitioner argued that the evidence had been excluded in violation of state law.  Petitioner raised his federal claim for the first time in his motion for relief from judgment, which was denied by both the Michigan Court of Appeals and the Michigan Supreme Court on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

- 30 -

The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536 . A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

       To determine whether Petitioner has been denied relief based on a procedural default, we look to the last "reasoned judgment rejecting the [federal] claim." *Ylst*, 501 U.S. at 803. The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

       According to Mich. Ct. R. 6.508(D), a motion for relief from judgment may only be granted in limited circumstances, the relevant portion of which provides as follows:

> (D)  Entitlement to Relief.  The defendant has the burden of establishing entitlement to the relief requested.  The Court may not grant relief to the defendant if the motion
>
>       . . .
>
> > (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this sub-chapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;
> >
> > (3)  alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this sub-chapter, unless the defendant demonstrates

(a)  good cause for failure to raise such grounds on appeal or in the prior motion, and

(b)  actual prejudice from the alleged irregularities that support the claim for relief.  As used in this sub-rule, "actual prejudice" means that,

(i)  in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;

. . .

(iii)  in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case;

The Court may waive the "good cause" requirement of sub-rule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

Mich. Ct. R. 6.508(D).

Here, the Michigan Supreme Court expressly stated that it denied Petitioner's application for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)." (12/29/04 MSC Ord., docket #31.)  Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).  In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be

deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.

Because Petitioner's first ground for relief is procedurally defaulted, in order to be entitled to habeas review, he must demonstrate either cause excusing his default and actual prejudice or that he is actually innocent of the crimes for which he was convicted. In his ninth ground for habeas relief, Petitioner argues that appellate counsel rendered ineffective assistance by failing to raise all issues presented in the habeas petition.

To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted and not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted. However, because review of the claim was denied by the Michigan appellate courts pursuant to MICH. CT. R. 6.508(D), the claim is procedurally defaulted unless Petitioner can show cause excusing his failure to present the claim on direct appeal. *See Edwards*, 529 U.S. at 453-54 (remanding for determination of whether the petition can show cause and prejudice excusing default of the ineffective assistance of appellate counsel claim).

It is unclear under Sixth Circuit precedent whether Petitioner may show cause excusing the default of his claim of ineffective assistance of appellate counsel. Arguably, because

requiring Petitioner to bring a claim of ineffectiveness of appellate counsel on direct appeal would unreasonably force Petitioner to take a position at odds with the attorney representing him on appeal, cause exists for bringing an ineffective assistance of appellate counsel claim for the first time in a motion under MICH. CT. R. 6.500. *See Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007) (implicitly concluding that ineffective assistance of counsel claim was not defaulted notwithstanding the fact that it was raised for the first time in a motion under MICH. CT. R. 6.500); *Bradley v. Birkett*, 192 F. App'x 468, 474-80 (6th Cir. 2008) (same); *but see Burroughs v. Makowski*, No. 03-1984 (6th Cir. June 7, 2005) (concluding that claim of ineffective assistance of appellate counsel could not serve as cause excusing procedural default because it was raised for the first time in motion under MICH. CT. R. 6.500 and was rejected by Michigan appellate courts under MICH. CT. R. 6.508(D), an implicit finding that Petitioner failed to demonstrate cause and prejudice under that rule). Nevertheless, it unquestionably is true that Petitioner failed to raise his claim of ineffective assistance of appellate counsel at his first clearly available opportunity: his application for leave to appeal to the Michigan Supreme Court. As a consequence, I conclude that his claim of ineffective assistance of appellate counsel is procedurally defaulted.

Moreover, even had Petitioner properly exhausted his ineffective-assistance-of-appellate-counsel claim, Petitioner fails to demonstrate cause excusing his procedural default. In order to serve as cause excusing procedural default, Petitioner must show that his appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984). *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). Under *Strickland*, the petitioner must prove the following to establish a claim of ineffective assistance of counsel: (1) that counsel's performance fell below an objective standard

- 34 -

of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See McFarland*, 356 F.3d at 699 *(*citing *Greer*, 264 F.3d at 676). Moreover, an appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2002). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289.

Petitioner fails to demonstrate that his constitutional challenge to the exclusion of evidence about Rex Bell's death was "clearly stronger' that the five significant claims of error raised by appellate counsel. Appellate counsel provided an extended argument under Michigan law as to the impropriety of limiting Petitioner's evidence concerning the death of Rex Bell. In a ten-page opinion, the court of appeals gave careful consideration to the argument and to Petitioner's other claims on appeal. Each of those claims was well supported in the law and the facts.

Petitioner's present claim is that he was unreasonably denied his constitutional right to present a defense by the court's refusal to allow collateral evidence of an unrelated incident, the death of Rex Bell.  The Supreme Court has held that the right to present a defense has its sources in the Due Process Clauses of the Fifth and Fourteenth Amendments and the Confrontation and Compulsory Process Clauses of the Sixth Amendment.  *See Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987);  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  The right to present a defense, however, is not absolute.  *See Taylor v. Illinois*, 484 U.S. 400, 409 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *see also Michigan v. Lucas*, 500 U.S. 145, 152 (1991) (noting that the *Taylor* court "rejected the defendant's argument that, under the Compulsory Process Clause of the Sixth Amendment, preclusion is never a permissible sanction for a discovery violation") (emphasis and quotation marks omitted). As the Supreme Court reiterated most recently in *United States v. Scheffer*, 523 U.S. 303, 308 (1998):

> state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve."

*Id.* (quoting *Rock*, 483 U.S. at 56).

Petitioner cannot and does not demonstrate that the trial court's decision to exclude evidence about the Rex Bell case was either arbitrary or disproportionate to the trial court's concerns embodied by the state-law evidentiary rules.  As the Michigan Court of Appeals found, the evidence was only marginally probative.  The principal issue for the jury was Petitioner's level of concern about the safety of his brother.  "[E]vidence that defendant had a friend who died after being ejected from a different bar by different security personnel did not tend to prove or disprove that defendant

- 36 -

was so gravely concerned for his brother's welfare that the use of deadly force was necessary."

(12/26/00 MCOA Op. at 2.)  The testimony therefore had "only marginal probative value."  (*Id.*)

However, as the court of appeals noted,

> the potential for prejudice and jury confusion was great.  Injecting evidence about
> the death of another individual several years before the instant offense, at a different
> location, involving different security personnel, invited the jury to consider
> unrelated, collateral issues that would detract from their focus on the facts and
> evidence in the instant case.

(*Id.*)

The findings by the Michigan Court of Appeals were entirely reasonable and grounded in standard evidentiary rules designed to protect the integrity of the proceedings.  *See Scheffer*, 523 U.S. at 308.  Further, Petitioner introduced other evidence about the level of his concern about his brother's welfare, including the testimony of John Buck.  Buck expressly testified that he was screaming at the bouncers about choking Petitioner's brother, Victor, reporting that he believed that the choking had caused Victor to pass out.  (Tr. III, 475-76).  Buck further testified that he told Petitioner that the bouncers had been choking Victor.  (Tr. III, 479.)  And Victor undisputedly was rendered unconscious by the time he was removed from the bar.

Petitioner therefore was not entirely barred from presenting his defense.  He was free to and did argue that the bouncer's use of a hold around his brother's neck and the apparent unconscious condition of his brother reasonably caused him to fear for his brother's life.  The introduction of evidence about the conduct of other bouncers at another location at some prior time unquestionably had the potential to confuse the issues legitimately presented to the jury.  It also had the potential for unfair prejudice, as a jury's concern about the behavior of other bouncers could have affected its evaluation of the behavior of the bouncers in the case at bar.

- 37 -

The trial court's exclusion of the testimony regarding Rex Bell's death does not clearly appear to be arbitrary nor disproportionate to the legitimate state concerns before the court. As a result, Petitioner fails to demonstrate that his due process claim was clearly stronger than the state-law evidentiary claim raised by appellate counsel. *Smith*, 528 U.S. at 289. Petitioner therefore fails to demonstrate the ineffective assistance of appellate counsel that would excuse his procedural default.

II.    <u>Ground 2: Witness in Jail Uniform and Handcuffs</u>

In his second ground for habeas relief, Petitioner contends that he was prejudiced when the trial court required his brother to testify in handcuffs and a yellow jail uniform. Although Petitioner does not cite the constitutional underpinnings of his claim, the cases he cites rely on an analysis of due process rights under the Fourteenth Amendment. *See Estelle v. Williams*, 425 U.S. 501 (1976); *Kennedy v. Cardwell*, 487 F.2d 101, 105 n.5 (6th Cir. 1973).

On direct appeal, Petitioner's claim was presented solely as one of state law. The federal constitutional issue was raised for the first time in Petitioner's motion for relief from judgment. Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal the trial court's denial of the motion for relief from judgment on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D). As a consequence, for the reasons previously discussed, Petitioner's second ground for relief is procedurally defaulted. *See Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.

Again, Petitioner asserts that the ineffective assistance of appellate counsel constitutes grounds excusing his procedural default. The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner

on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

      In reviewing Petitioner's claim on appeal, the Michigan Court of Appeals held that, under long established Michigan case law, restraints in the courtroom are permitted only "to prevent escape of the prisoner, to prevent the prisoner from injuring others, or to maintain an orderly trial." (MCOA Op. at 9.)  The court concluded that, in the absence of a showing of such risks, the trial court abused its discretion in failing to remove the handcuffs.  (*Id.* at 3.)  The court found, however, that the error was harmless beyond a reasonable doubt.

      Unlike the state court, on habeas review, this Court looks solely to the question whether the Supreme Court has determined that Petitioner a clearly established right under the federal Constitution to have his witnesses appear at trial unshackled and in civilian attire.  *See* 28

U.S.C. § 2254(d); *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655. The Court has no authority to look to lower court cases for that rule. *Bailey*, 271 F.3d at 655.

The Supreme Court has recognized that due process bars a defendant being compelled to stand trial in jail garb, if the defendant has made a timely objection. *See Estelle*, 425 U.S. at 513-14. Similarly, the Court long has recognized that, during the guilt phase of a criminal trial, the Due Process Clause of the Fifth and Fourteenth Amendments prohibits the use upon a defendant of "physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005) (citing *Holbrook v. Flynn*, 475 U.S. 560, 568-69; *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970)). The Court recently has recognized that the prohibition also extends to the sentencing phase of a capital trial. *Deck*, 544 U.S. at 633.

The Court, however, has never considered or decided whether the prohibition applies to a defense witness. Nor does extension of the prohibition inevitably follow from the reasoning of the Supreme Court's decisions governing the dress and shackling of defendants. In both the cases involving jail garb and those involving shackles, the Court has acknowledged that the principal interest protected by the Due Process Clause is the presumption of innocence accorded criminal defendants, a presumption that is undercut when the prisoner must stand before jurors dressed as a criminal and shackled. *See Deck*, 544 U.S. at 630; *Estelle*, 425 at 503; *Holbrook*, 475 U.S. at 569. That presumption is inapplicable to a situation involving a defense witness: defendants are not entitled to a presumption that their witnesses are innocent.

Accordingly, because the Supreme Court has never established a constitutional right barring defense witnesses from testifying in prison garb or shackles, Petitioner is not entitled to relief on his second habeas ground.

III.     Ground 3:  Intimidation of Juror

Petitioner asserts in his third habeas ground that he was denied due process when one or more jurors was intimidated by the jury foreman.  According to testimony taken at an evidentiary hearing on Petitioner's motion for new trial, juror Catherine Jacobs wrote a letter to the trial judge on the Monday following the entry of the Friday guilty verdict.  (4/1/98 Hrg. Tr. at 9-10, docket #22.) In her letter, Jacobs expressed concern about the way the verdict was reached.  (*Id.*)  Jacobs testified that she and three other jurors believed that the verdict most properly should be guilt on the offense of assault with intent to commit great bodily harm, rather than assault with intent to murder. The foreman repeatedly told the other jurors that intent was irrelevant; the only issue was whether an ordinary person would pull out a gun and fire at people.  (*Id.* at 10-11.)  Jacobs denied that the foreman was intimidating.  Instead, she testified that he was insistent that the jurors disregard the issue of intent.  (*Id.* at 13.) Jacobs also testified that various jurors concluded that Petitioner was in a gang and expressed their beliefs that gang members wanted to kill people.  (*Id.* 14.)  One juror expressed her belief "that these kids are all alike, that they are angry, and that they think that society owes them, and she said she's seen people like the Defendant before . . . ."  (*Id.* at 14.)  Another juror stated, "Oh, this country's going to hell because people get let off, and they let all the bad guys go free." (*Id.*)  Jacobs stated that the day had been long, that jurors did not have a dinner break, and that she felt worn down by the other jurors, one of whom was angry that the trial had continued so long that he would miss a big band concert.  (*Id.* at 14-15, 18.)

At the close of the hearing, the trial court denied the motion for new trial, holding that the jury verdict was not impeachable on the basis of Jacobs' allegations, which involved misconduct inhering in the jury deliberations, rather than from improper influence by external factors.  (*Id.* at 20-24.)  Petitioner challenged the denial of new trial on direct appeal, raising only a state-law claim. The Michigan Court of Appeals affirmed on the same grounds.  (MCOA Op. at 4 (citing *People v. Budzyn*, 566 N.W.2d 229 (Mich. 1997), and *Hoffman v. Spartan Stores, Inc.*, 494 N.W.2d 811 (Mich. Ct. App. 1992)).)

Petitioner contends that the denial of a new trial violated his Sixth Amendment right to a trial by an impartial jury.  The claim is without merit.[2]

The Supreme Court long has recognized the common-law rule prohibiting the admission of juror testimony to impeach a jury verdict.  *See Tanner v. United States*, 483 U.S. 107, 117-18 (1987) (citing history beginning in 1785).  The Court has acknowledged, however, that certain kinds of external influences on the jury may implicate the guarantee of a fair trial by an impartial jury.  *See Tanner*, 483 U.S. at 117-18, 126-27; *Turner v. Louisiana*, 379 U.S. 466 (1965) (holding that the regular association during trial between the jury and two deputy sheriffs who testified at trial undermined the defendant's right to a fair trial by an impartial jury); *Remmer v. United States*, 347 U.S. 227, 230 (1954) (holding that allegations of influence by an unnamed person outside the jury required the holding of an evidentiary hearing to determine extrinsic influence); *Mattox v. United States*, 146 U.S. 140, 149 (1892) (holding admissible testimony of jurors describing jury review of information not admitted into evidence).  In *Tanner*, 483 U.S. at 126-27,

---

[2]The claim appears procedurally defaulted as it was not raised on direct appeal and it was denied on collateral review under MICH. CT. R. 6.508(D).  However, for the sake of efficiency, the claim is addressed on the merits.  *See Hudson*, 351 F.3d at 216 (holding that court may address procedurally defaulted claim on the merits where it is more efficient to do so).

the Supreme Court discussed the interplay between Rule 606(b) of the Federal Rules of Evidence and a defendant's Sixth Amendment right to a fair trial . . . ." *See Garcia v. Andrews*, 488 F.3d 370, 375 (6th Cir. 2007) (citing *Tanner*, 483 U.S. at 120). The *Tanner* Court considered whether the trial court had erred in refusing to hold an evidentiary hearing concerning whether jurors had consumed alcohol at lunch during the course of the trial, causing them to sleep during the afternoon. The Court upheld the lower court's decision and enforced the longstanding common law evidentiary rule embodied by FED. R. EVID. 606(b), which bars investigation into the effect of anything upon a juror's decision, except in cases involving outside influences that may have improperly been brought to bear. *Id.* at 119-125. The *Tanner* Court concluded that juror intoxication did not constitute an outside influence. *Id.* at 125.

In an unpublished decision, the Sixth Circuit has addressed a habeas claim similar to Petitioner's. In *Kretzer v. Huffman*, No. 99-3173, 2000 WL 658022 (6th Cir. May 8, 2000), the court rejected as meritless a petitioner's habeas claim that two jurors were improperly coerced into finding him guilty, that the jurors were biased, and that they considered "extra-record" incriminating facts about him. *Id.* at *2. The court concluded that the petitioner's allegations involved matters intrinsic to the jury deliberations. It held that the introduction of juror affidavits as to the alleged facts was "precluded by the rule that jurors may not impeach their own verdict, absent extrinsic evidence of juror wrongdoing." *Id.* (citing *Tanner*, 483 U.S. at 117-27).

Similarly, in *Garcia*, 488 F.3d at 375-76, the Sixth Circuit concluded that no hearing was required where the petitioner alleged only that a juror had a subjective fear of rendering a verdict based on the fact that he worked in an area where the defendant's family owned property, despite the fact that the juror had shared that fear with other jurors. The court concluded that the

- 43 -

allegations did not involve any outside influence on the jurors and that a *Remmer* hearing therefore was not required to inquire into the verdict. *Id.* The *Garcia* court reiterated the Sixth Circuit's definition of an "'extraneous influence on a juror [as] one derived from specific knowledge about or a relationship with either the parties or their witnesses.'" *Id.* at 376 (quoting *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)).

Under these authorities, the allegations in the instant case involve matters intrinsic to the jury's deliberations. As such, the jury's verdict is not subject to impeachment by evidence from one of the jurors. Petitioner's third ground for habeas relief therefore is without merit.

IV.   Ground 4: Ineffective Assistance of Counsel on Plea Bargain

In his fourth ground for habeas relief, Petitioner contends that he was denied the effective assistance of trial counsel when counsel misled him and concealed information about a plea bargain. Petitioner's recitation of the basis of his claim is brief:

> Petitioner José Torrez (Jaime Gonzales) was informed by counsel that there was an offer that if he pled to assault with intent to do great bodily harm, other charges would be dismissed and he would get a 4 to 10 year sentence. Petitioner came to court prepared to enter such a plea. However, Petitioner had also asked his attorney for copies of the police reports and other documents before making his decision. When Petitioner arrived at court, the attorney told him that he simply needed to plead guilty, and the attorney would not be providing any documents. Further, the attorney whispered to Petitioner that when the judge asked how he pled to the "supplement," Petitioner should say guilty. Petitioner did not know what was a supplement, and asked the attorney. The attorney said it would double his sentence. Petitioner, having been jerked around by the attorney in an appalling way, had no choice but to reject the plea offer, as he was not sure what it was, was told at the last minute it was being doubled, and the attorney intentionally decided to prevent Petitioner from having any of the documents needed for Petitioner to judge whether a guilty plea would be a good idea.

> The attorney later admitted to the Court "My client feels if I had given him a police report before Tuesday he would have pled."

(Br. in Supp. of Pet., at 24, docket #1-2.)  Petitioner raised the issue for the first time in his motion

for relief from judgment.  Both the Michigan Court of Appeals and the Michigan Supreme Court

denied leave to appeal on the grounds that Petitioner had failed to demonstrate entitlement to relief

under MICH. CT. R. 6.508(D).  His claim, therefore, is procedurally defaulted absent a showing of

cause excusing the procedural default and actual prejudice resulting from it.  *Murray*, 477 U.S. at

485.  As with his other defaulted claims, Petitioner generally raises the ineffective assistance of

appellate counsel as cause excusing his default. Arguably, as previously discussed, the ineffective-

assistance-of-appellate-counsel claim is itself defaulted, as the claim was rejected by the Michigan

Supreme Court for failure to meet the requirements of MICH. CT. R. 6.508(D).

Regardless, the claim must be rejected because Petitioner has failed to demonstrate

a factual basis for the claim.  Petitioner failed to develop any factual record in the state court.  He

requests an evidentiary hearing in this Court, but he has failed to argue, much less demonstrate, his

entitlement to an evidentiary hearing under the applicable federal standard.

The AEDPA has codified a strict standard governing the availability of evidentiary

hearings on habeas review.  Pursuant to 28 U.S.C. § 2254(e)(2),

> (2)  If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the claim unless the
> applicant shows that –
>
> (A)  the claim relies on –
>
> (i)  a new rule of constitutional law, made retroactive to cases on collateral
> review by the Supreme Court, that was previously unavailable; or
>
> (ii)  a factual predicate that could not have been previously discovered
> through the exercise of due diligence; and

- 45 -

(B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.*  The Supreme Court has held that, under § 2254(e)(2), a petitioner is held to have "failed to develop the factual basis of a claim" where "there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *Williams*, 529 U.S. at 432.

The *Williams* Court concluded that the petitioner had failed to demonstrate the requisite diligence in developing the factual record in state court because the attorney had taken only limited steps to receive a copy of a know psychiatric report and had failed to follow-up when the request was denied absent a court order.  *Williams*, 529 U.S. at 439-40.  The Court further recognized that counsel's lack of diligence, if any, was chargeable to the petitioner under § 2254(e)(2).  *See Holland v. Jackson*, 542 U.S. 649, 653 (2004) (citing *Williams*, 529 U.S. at 439-40).

Here, Petitioner never properly requested an evidentiary hearing in state court.  In his motion for relief from judgment, Petitioner simply asserted facts without supporting documentation, and he did not properly request a hearing on the issue, either from the circuit court or in the court of appeals.  (Pet. App. for Lv. to Appeal, docket #30.)  Although Petitioner closed his 48-page brief on appeal with a one-sentence request for a hearing under *People v. Ginther*, 212 N.W.2d 922, 925 (Mich. 1973), he at no time specified the need for the taking of evidence on the allegations regarding the plea offer.  (*Id.*)  He also failed to move to remand to the trial court for the *Ginther* hearing.

Under Michigan law,

A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the

- 46 -

> purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts except in the rare case where the record manifestly shows that the judge would refuse a hearing; in such a case the defendant should seek on appeal, not a reversal of his conviction, but an order directing the trial court to conduct the needed hearing.

*Id.*  The Michigan Court of Appeals requires that any requests for an evidentiary hearing must be made in a proper motion to remand, accompanied by an affidavit or offer of proof demonstrating factual support for a claim of ineffective assistance of counsel.  *See* MICH. CT. R. 7.211(C)(1)(a). Petitioner failed to make or support the requisite motion.

Petitioner therefore cannot demonstrate the necessary diligence entitling him to an evidentiary hearing in this Court under § 2254(e)(2)(A)(ii).  In addition, Petitioner makes no attempt to argue or demonstrate that he can meet the further requirements of § 2254(e)(2)(B).  Accordingly, Petitioner fails to meet the requirements for development of a record that would support his fourth ground for habeas relief.  Accordingly, I recommend denying the claim.

V.    Ground 5:  Denial of Due Process by Reference to Gang Membership

Petitioner argues that he was denied due process when the prosecutor asked Petitioner's witness, John Buck, if he had a gang tattoo.  (Tr. III, 483.)  Buck denied that his tattoo was gang related or in gang colors.  (*Id.*)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a

- 47 -

conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.  Indeed, Petitioner has failed to show error of any sort.  While the prosecutor asked a question of Buck that Petitioner contends unfairly impugned the witness, Buck squarely denied having a gang tattoo.  And the trial court clearly instructed the jury that "[t]he lawyers' questions to the witnesses are also not evidence.  You should consider these questions only as they give meaning to the witnesses' answers."  As a result, no evidence was introduced at all, much less prejudicial evidence.

In addition, the single question by the prosecutor does not amount to prosecutorial misconduct.  For habeas relief to be granted on the basis of prosecutorial misconduct, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel, and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Here, the alleged misconduct involved a single question to a single witness. The question was not egregiously misleading, and a curative instruction was given by the court. Moreover, the underlying facts of the case were without dispute, and Buck's general testimony was consistent with that of the prosecution witnesses. As a result, the potential for prejudice was extremely small.

Petitioner attempts to bolster his claim, however, with a reference to the testimony of the juror regarding the jury's deliberations. As I previously have discussed, however, a juror's testimony about matters intrinsic to the deliberations may not be introduced to impeach the verdict. *Tanner*, 483 U.S. at 117-18. Petitioner may not invoke such inadmissible evidence to indirectly challenge that verdict by suggesting that the jury improperly relied on some remark at trial.

In sum, Petitioner fails to raise a concern of constitutional magnitude. The prosecutor's question to Buck in no way infected the trial with unfairness.

VI.   Ground 6:  Insufficient Evidence of Assault with Intent to Murder

Petitioner asserts that the prosecutor introduced insufficient evidence to support the verdict of assault with intent to commit murder.  A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

On direct appeal, Petitioner raised only a state-law challenge to the sufficiency of the evidence.  The state court rejected the claim, reasoning as follows:

> This Court reviews a sufficiency of the evidence challenge by viewing the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of crime were proven beyond a reasonable doubt.  *People v Wolfe*, 440 Mich508, 515; 489 NW2d 748, amended on other grounds 441 Mich 1201 (1992); *People v Hutner*, 209 Mich App 280, 282; 530 NW2d 174 (1995).  This Court should not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses. *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997).  Circumstantial evidence and reasonable inferences which arise from the evidence can constitute satisfactory proof of the elements of the crime.  *People v Truong (After Remand)*,

- 50 -

218 Mich App 325, 337; 553 NW2d 692 (1996). Because of the difficulty in proving an actor's state of mind, minimal circumstantial evidence and the reasonable inferences that can be derived therefrom constitute sufficient evidence of intent to kill. *People v McRunels*, 237 Mich App 168, 181; 605 NW2d 95 (1999).

The elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *McRunels, supra* at 181; *People v Barclay*, 208 Mich App 670, 674; 528 NW2d 842 (1995). The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or offer with force or violence to do corporal hurt to another (an assault), (2) coupled with an intent to do great bodily harm less than murder." *People v Pena*, 224 Mich App 650, 659; 569 NW2d 871 (1997), modified and remanded on other grounds 457 Mich 885; 586 NW2d 925 ((1998).

Viewed in a light most favorable to the prosecution, we find there was sufficient evidence to sustain defendant's convictions of assault with intent to murder and assault with intent to cause great bodily harm less than murder. The testimony at trial revealed that defendant exited the bar after his brother was forcibly ejected, walked directly toward Byrd, one of the bouncers, and pushed him backwards so that he lost his balance. Byrd and Cryblsky, another bouncer, both testified that they saw defendant move his hand toward his waistband and they tried unsuccessfully to pin down defendant's arms. Defendant then fired two gunshots striking Byrd in the left knee. Cryblsky testified that he was afraid he would be shot so he ran around the corner of the building. Witzke, another bouncer, saw defendant chase Cryblsky and point a gun at Cryblsky's head. Witzke followed defendant and tried to grab his hand, but defendant pushed the gun toward Witzke's midsection and fired the gun twice. As Witzke again tried to grab the gun away, defendant fired several more shots striking Witzke's left arm at point blank range. Defendant continued to struggle with the bouncers even after they had been shot, and further resisted the state troopers who took him into custody. The evidence additionally established that defendant's semi-automatic gun (which required defendant to squeeze the trigger each time he wanted to fire or hold the trigger back in which case the gun would repeatedly fire) held between seven and twelve rounds and the clip was entirely empty when the policy retrieved the gun from defendant. Finally, testimony from the treating physician established that although neither bullet-wound was immediately life-threatening, Byrd's wound could have caused lead poisoning and Witzke's wound could have cut off blood flow and resulted in the loss of his arm had the bullets not been immediately removed. On this record, we find there was ample evidence to permit a rational trier of fact to find that the requisite intent for assault with intent to murder Witzke and assault with intent to do great bodily harm to Byrd was proven beyond a reasonable doubt. *Wolfe, supra*.

(12/26/00 MCOA Op at 5-6, docket #26.)  Although the state court of appeals applied Michigan law to its analysis, the standard of review under state law tracks the federal standard.  As a consequence, the state-court's decision is entitled to deference unless that decision was contrary to or an unreasonable application of clearly established United States Supreme Court precedent.  28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655.

Petitioner argues that the evidence was insufficient to support an intent to kill, basing his argument on a characterization of the evidence that favored the defense, contrary to controlling precedent.  *See Jackson*, 443 U.S. at 319 (requiring that facts be viewed in the light most favorable to the prosecution).  Petitioner does not dispute any fact relied upon by the Michigan Court of Appeals.  As the court of appeals indicated, Petitioner first assaulted Byrd and pushed him down. He then reached into his waistband, apparently to draw a gun, which the evidence indicates he ultimately did.  Witzke testified that he saw Petitioner aim his gun at Cryblsky.  He also testified that, while he was struggling with Petitioner, Petitioner continually tried to aim the weapon toward Witzke's midsection.  Petitioner also repeatedly fired the weapon, as many as seven times.  In addition, the evidence indicated that Petitioner's actions were directed at individuals who were not in any way assaulting his brother at the time.  The Michigan Court of Appeals' determination that a rational jury reasonably could have inferred that Petitioner intended to murder Witzke was neither contrary to nor an unreasonable application of established Supreme Court precedent.

VII.     Ground 7: Improper Refusal to Discharge Appointed Counsel

In his seventh ground for habeas relief, Petitioner asserts that the trial court deprived him of his Sixth Amendment right to counsel when it refused to appoint substitute counsel. Respondent contends that Petitioner failed properly to raise his federal claim on direct appeal, instead arguing the issue solely under state law. Respondent therefore asserts that the claim is procedurally defaulted.

Notwithstanding the fact that Petitioner relied upon state cases in his direct appeal, those cases analyzed the federal constitutional issue. A petitioner fairly presents his federal constitutional claim when he relies on state cases employing constitutional analysis. *See McMeans v. Brigano*, 228 F.3d 674, 680 (6th Cir. 2000); *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987). Petitioner's claim, therefore, is not procedurally defaulted. Upon review, however, the claim lacks merit.

The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defence." U.S. CONST., amend. VI. One element of that right is the right to have counsel of one's choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). However, the right to counsel of choice is not without limits. *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)). "'An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.'" *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th

- 53 -

Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").

"In order to decide whether a district court has abused its discretion, we must consider the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Saldivar-Trujillo*, 380 F.3d 274, 277 (6th Cir. 2004), *quoted in Mooneyham*, 473 F.3d at 291. Courts considering such motions must balance "the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.*

The Michigan Court of Appeals addressed Petitioner's claim at length, as follows:

An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have an attorney of his choice simply by requesting that his appointed attorney be replaced. *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991). Appointment of substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. *People v Ginther*, 390 Mich 436, 441; 212 NW2d 922 (1973); *Mack, supra* at 14; *People v Jones*, 168 Mich App 191, 194; 423 NW2d 614 (1988). Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic. *People v. Williams*, 386 Mich 565, 573; 194 NW2d 337 (1972); *Mack, supra*.

Our thorough review of the record demonstrates that defendant did not establish good cause to support his request for substitute appointed counsel. While the record reflects defendant's dissatisfaction with the general manner in which defense counsel was handling his case, defendant failed to make any showing that there was a legitimate disagreement with his counsel over fundamental trial tactics. *Mack, supra* at 14; *Williams, supra* at 565. Instead, defendant merely asserted his belief that counsel was not interested in his case. Contrary to defendant's contention, the record shows that counsel presented two defense witnesses, effectively cross-examined prosecution witnesses, and presented a cogent and vigorous defense. We are not convinced that the trial court's refusal to appoint new counsel was an abuse of discretion.

- 54 -

We also find no merit to defendant's claim that the trial court abused its discretion in denying defendant's request for an adjournment of trial to retain substitute counsel. Defendant's request came at a very late stage in the trial when only one witness and closing arguments remained. The trial court properly concluded that to adjourn trial at that time would be "an absolutely appalling waste of resources and there's no good cause at all shown for it." Furthermore, when asked the name of substitute counsel defendant intended to retain, defendant initially refused to disclose the attorney's name and then inaccurately stated the attorney's name only to be corrected by appointed counsel. In addition, when asked by the trial court when substitute counsel would be available to appear, defendant first stated "[s]oon as whenever," but when pressed by the trial court, defendant finally indicated that he would need to adjourn the case over the weekend without any further indication as to when substitute counsel could appear. On this record, the trial court did not abuse its discretion in denying defendant's request for an adjournment to obtain substitute counsel.

(12/26/00 MCOA Op. at 4-5.)

The state court's conclusions were not unreasonable applications of established Supreme Court precedent. The state court applied Michigan law, which substantially reflected federal constitutional principles. *See, e.g., People v. Williams*, 194 N.W.2d 337 (Mich. 1972) (citing United States Supreme Court precedent and Constitution). In repeatedly requesting the appointment of replacement counsel, Petitioner failed to demonstrate a legitimate disagreement over fundamental trial principles. Instead, Petitioner repeatedly declared that his problems with his attorney rested solely on his own perception that the attorney did not care about the case, an assertion at clear odds with counsel's in-court performance. *Cf. Morris v. Slappy*, 461 U.S. 1, 9-10 (1983) (upholding reasonableness of trial court's conclusion that the efficient administration of justice justified denial of the motion for continuance where counsel was prepared and reason for requested delay was defendant's mere preference for different attorney). Moreover, Petitioner did not seek to retain substitute counsel until the last day of trial, immediately before the testimony of the final witness. Even then, Petitioner initially refused to identify the proposed substitute counsel and refused to

- 55 -

declare with precision the length of continuance required.  The trial court reasonably concluded that Petitioner was attempting to delay the trial and that considerations of judicial efficiency justified denying Petitioner's request for a continuance.  *See Morris*, 461 U.S. at 11-12 ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.") (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).  I therefore recommend that the Court deny Petitioner's seventh ground for habeas relief.

VIII.    Ground 8:  Ineffective Assistance of Trial Counsel

In ground nine of the petition, Petitioner raises an independent claim that he was prejudiced by the ineffective assistance of trial counsel.[3]  In support of his claim, Petitioner argues in a wandering fashion that trial counsel was ineffective in numerous ways: (1) by failing adequately to prepare for trial before the day it was scheduled to begin; (2) by failing to investigate defense witnesses until a week before trial and failing to learn of four defense witnesses until the day before testimony began; (3) by failing to present evidence about the Rex Bell incident and failing to present any significant evidence of Petitioner's state of mind; (4) by failing to object to Petitioner's brother appearing in handcuffs and a jail jumpsuit; (5) by failing to secure an instruction on the intoxication defense to the specific intent crime of assault with intent to murder and assault with intent to do great bodily harm; and (6) by failing to seek an expert witness on intoxication.

On direct appeal, Petitioner raised four claims of ineffective assistance of counsel: (1) counsel failed to present a duress defense or any other viable defense; (2) counsel never moved

---

[3]I previously have discussed Petitioner's claims that the ineffective assistance of trial counsel constituted cause excusing his procedural default of Grounds I, II and IV.  In his independent claim, Petitioner contends that counsel's failure to raise the claims set forth in those grounds, together with other trial errors, amounted to the ineffective assistance of trial counsel.

for discovery; (3) counsel failed to advise him of his absolute right to testify; and (4) counsel failed to object to improper prosecutorial remarks.  Two of these claims (that counsel failed to present a duress defense and failed to move for discovery) arguably encompass the second and third assertions of ineffective assistance of counsel on habeas review (that counsel failed to investigate defense witnesses and failed to present evidence about the Rex Bell incident or other evidence of Petitioner's state of mind).  Petitioner's remaining claims, however, are procedurally defaulted and are not cognizable on habeas review unless Petitioner can demonstrate cause excusing the default and actual prejudice resulting from it.  *Murray*, 477 U.S. at 485.

As with his other defaulted claims, Petitioner generally raises the ineffective assistance of appellate counsel.  However, as previously discussed, the ineffective-assistance-of-appellate-counsel claim itself appears defaulted, as the claim was rejected by the Michigan Supreme Court for failure to meet the requirements of MICH. CT. R. 6.508(D).  Because the claims lack merit, however, I will address each claim without first resolving whether Petitioner has shown cause and prejudice excusing his procedural default.  *See Hudson*, 351 F.3d 216 (holding that court may address procedurally defaulted claim on the merits where it is more efficient to do so); *Cone*, 243 F.3d at 971 (deciding claim on the merits, assuming without deciding that the Petitioner did not procedurally default it or could show cause and prejudice).

As previously discussed, to establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland*, 466 U.S. at 687-88.  A court considering

- 57 -

a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

### A.     Failure to prepare for trial

Petitioner's first assertion of ineffective assistance clearly does not meet the heavy burden set forth in *Strickland*.  Petitioner argues that his attorney rendered ineffective assistance of counsel by failing to prepare for trial before the day it was scheduled to begin.  According to Petitioner, counsel's failure to prepare resulted from an attempt to "bulldoze" Petitioner into a plea agreement without providing the discovery materials and without filing a motion to quash.  (Br. in Supp. of Pet. at 50.)

Upon review of the record, it is apparent that defense counsel engaged in substantial discussions with both Petitioner and the prosecutor concerning a plea agreement.  Counsel understood that an agreement had been reached the Friday preceding trial and therefore did not prepare to begin trial on the scheduled date, expecting that Petitioner would be entering a guilty plea. On the date of trial, Petitioner advised counsel that he wished to proceed to trial.  Petitioner contradicted his attorney's version of the events, declaring that he had told counsel that he wanted to proceed to trial and had wanted him to file a motion to "squash" and various other motions.  He also complained that he had not received documents requested from his attorney and he complained that he had been provided a document that morning that he had never seen.  (Tr. I, 4-5.)  Defense counsel replied that no grounds existed for filing a motion to quash, that he had reviewed all the evidence, and that he had sent Petitioner a copy of the police reports and preliminary examination transcript the preceding December.  The only new document  provided to Petitioner on the date of trial was a copy of an information in which a lesser sixth count had been added to conform with the

proposed plea agreement.  (Tr. I, 5-6.)  However, in light of Petitioner's aspersions, counsel advised the court that he believed there had been a breakdown in the relationship between counsel and the defendant.  He further advised that he was unable to represent Petitioner at that time because he was unprepared.  (Tr. I, 6.)

The court rejected Petitioner's version of the events.  The court further found that Petitioner's claims about counsel were frivolous, lacked good faith, and were made by Petitioner to delay trial.  (Tr. I, 9-10.)  The court concluded, however, that defense counsel reasonably had believed the matter resolved by negotiated settlement and was not prepared to begin the evidentiary stage of trial that day.  (Tr. I, 10.)  The court therefore granted a brief recess for counsel to delay another matter and then proceeded to pick the jury.  The court, however, agreed to delay further proceedings until two days later, to allow counsel time to prepare.  (Tr. I, 10-12, 13, 19.)

The trial court's credibility findings are entitled to a presumption of correctness, which the petitioner has the burden of rebutting by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner, however, has done no more that repeat the assertions found by the trial court to be frivolous.  The trial court's findings were patently reasonable on the record evidence.  Petitioner therefore fails to demonstrate that counsel's performance was deficient in failing to appear on the first day of trial fully prepared to try the case.

Further, Petitioner can demonstrate no prejudice flowing from the alleged failure to prepare.  The trial court granted a two-day continuance for counsel to prepare for trial, which counsel acknowledged would be sufficient for him to proceed.  Petitioner has failed to demonstrate

- 59 -

that, when the trial resumed after jury selection, counsel was unprepared.[4]  For both reasons, Petitioner fails to prove that counsel was ineffective.

### B.        Failure to investigate defense witnesses

Petitioner alleges that counsel failed to investigate defense witnesses.  As a consequence, he alleges, defense counsel did not learn of these witnesses until 7:00 p.m. the night before trial resumed.  Petitioner contends that the failure to investigate violates constitutional requirements.

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

---

[4]I address Petitioner's claims that counsel failed to investigate or call witnesses separately, *infra.*

Petitioner does not identify what witnesses he believes were neither investigated or called who would have made a difference at his trial.  He cites to the record from the third day of trial, in which Petitioner argued that his attorney had rendered ineffective assistance by not speaking with certain defense witnesses before that date.  The court concluded that Petitioner's complaints about counsel's investigation were frivolous, finding that counsel's failure to reach the witnesses in question resulted from Petitioner's own failures to cooperate with counsel.  (Tr. III, 379-80.)

The record amply supports the court's conclusions that counsel had rendered effective assistance and that Petitioner had created numerous difficulties for counsel in order to bolster his own desire to obtain a different attorney.  It is clear from the record that counsel had discussed proposed witnesses with Petitioner on the preceding Friday, Tuesday and Wednesday before trial resumed. (Tr. II, 104.)  He had been advised by Petitioner that the witnesses, who were close friends or family members (Tr. III, 379-80), would either contact counsel or counsel would be provided with contact information for those witnesses.  (Tr. II, 104-05.)  Petitioner never provided contact information until the second day of trial, and then only reluctantly, after he had complained to the court that counsel had not yet made contact with the witnesses. (Tr. II, 104-05.) Counsel at that time continued to have time to speak with witnesses before the defense case could begin.  Indeed, counsel subsequently spoke with two witnesses when they appeared that day and, in agreement with the prosecutor, represented that he would talk to the other two when they appeared later the third day. (Tr. III, 379-80.)  Counsel believed that, because the testimony was limited to two or three issues, he could adequately prepare to examine them.  (Tr. III, 380.)  The court again expressly found that Petitioner had engaged in conduct designed to delay trial and that his complaints were meritless. (Tr. III, 380-81.)  Petitioner advised the court that he had numerous additional proposed witnesses,

including all of those who were present for or aware of the Rex Bell incident.  (Tr. III, 382.)  The court reiterated that witnesses concerning the Rex Bell incident were not permitted to testify at trial. (Tr. II, 382-83, 384-85.)

On the third day of trial, Petitioner directly addressed the court, informing it that he had two additional witnesses, and counsel advised that Petitioner had identified those potential witnesses only that morning.  (Tr. III, 432.)  Petitioner also advised that, against the advice of counsel, he wanted to have a videotape shown to the jury that demonstrated Petitioner struggling with several officers at the jail and refusing a breathalyser test.  (Tr. III, 433.)  The court granted a recess for counsel to interview witnesses.  (Tr. III, 431.)  After the recess, defense counsel represented that he intended to call two witnesses for the defense, Victor Gonzales and John Buck, who would testify as to the state of Petitioner's sobriety.  (Tr. III, 433, 434-35.)  He then advised that he also had reviewed the videotape and believed it was unhelpful to the defense, as it showed Petitioner resisting being placed in restraints. (Tr. III, 435.)  However, counsel advised that, because Petitioner had a right to control his own defense, counsel was prepared to have the tape shown.  (Tr. III, 436.)  The court ruled that an additional witness proposed by Petitioner at the last minute would be excluded as related solely to the Rex Bell incident.  (Tr. III, 437.)

Each of the trial court's factual determinations was amply supported by the record. Petitioner does not identify any witness counsel should have presented who counsel did not present, other than alluding to the failure to introduce witnesses who would discuss the Rex Bell incident and Petitioner's reaction to it.  However, contrary to Petitioner's representations, counsel attempted to introduce evidence about the Rex Bell incident and made an offer of proof through Victor Gonzales and John Buck.  The trial court excluded the evidence.  As I previously have discussed, the trial

court's decision to exclude evidence about the Rex Bell incident was not constitutionally erroneous. As a result, Petitioner fails to demonstrate either that counsel's performance was deficient or that he was prejudiced in any way.

### C.   Failure to present evidence about the Rex Bell incident

Petitioner's third alleged failure of performance substantially repeats his second claim: failing to produce testimonial evidence about the Rex Bell incident. As I previously have discussed in sections I and VIII(B) of this report and recommendation, evidence of the Rex Bell incident was reasonably excluded, though counsel vigorously advocated its production. Petitioner can demonstrate no error, much less error of a constitutional dimension.

### D.   Failure to object to Petitioner's brother appearing in handcuffs and a jail jumpsuit

Petitioner argues that counsel was ineffective for failing to object to Victor Gonzales giving his testimony while handcuffed and clothed in a jail jumpsuit. As I previously have discussed, Petitioner had no constitutional interest in Victor Gonzales being clothed in civilian apparel and without restraints. Moreover, Petitioner himself objected to the appearance of his brother in such garb, and the trial court denied the objection. (Tr. III, 454-55.) As a consequence, Petitioner is unable to demonstrate prejudice. No basis exists for concluding that an objection by counsel rather than by Petitioner would have altered the trial court's decision.

Further, the state court reasonably concluded that, while the trial court's decision was erroneous under state law, the error was harmless. (12/26/00 MCOA Op. at 3.) The trial court gave a specific instruction to the jury to disregard the clothing and handcuffs. (Tr. III, 456.) Gonzales' testimony was limited to stating that both he and Petitioner were intoxicated, that he was grabbed by the bouncers when he became involved in the conflict in the bar, and that he had no memory of

any event after he passed out. (Tr. III, 440-43.) As the state court held, "[i]n light of our conclusion that the trial court's failure to remove Gonzales' handcuffs while testifying was harmless error, we find no prejudice to defendant resulting from counsel's failure to object to the situation." (12/26/00 MCOA Op. at 3.) The state court's determination constituted an entirely reasonable application of established Supreme Court precedent.

> **E.** **Failure to secure an instruction on the intoxication defense to the specific intent crime of assault with intent to murder and assault with intent to do great bodily harm**

Petitioner argues that counsel was ineffective by failing to secure an instruction that intoxication could be a defense to the specific intent required to prove assault with intent to murder and assault with intent to do great bodily harm. Petitioner's argument is frivolous. Contrary to his representations, the court expressly instructed the jury regarding the definition of specific intent and informed the jurors that Petitioner contended his intoxication prevented him from forming the requisite intent. (Tr. III, 569-70.) The court further instructed the jury that it "must decide whether the defendant's mind was so overcome by alcohol and drugs he could not have formed that intent." (*Id.* at 570.) The court provided detailed information to the jury about the things it should consider in making its determination, and it expressly informed the jury that the prosecutor had the burden of proving beyond a reasonable doubt that Petitioner could and did form the requisite intent. (*Id.*) Petitioner therefore fails to demonstrate the ineffective assistance of trial counsel.

> **F.** **Failure to seek an expert witness on intoxication**

Petitioner argues that effective counsel was required to secure expert testimony regarding intoxication and its effect on Petitioner's ability to form the specific intent necessary to prove assault with intent to murder and assault with intent to commit great bodily harm.

Petitioner's argument is without merit.  Contrary to Petitioner's general assertions, his intoxication defense was properly presented to the jury.  Defense counsel introduced evidence through both Victor Gonzales and John Buck that Petitioner was intoxicated at the time of the incident.  Counsel argued that Petitioner's intoxication prevented him from forming the requisite intent to kill or to commit great bodily harm.  The court instructed the jury that it must consider whether Petitioner's intoxication interfered with his capacity to form the requisite intent.

Petitioner has failed to identify what additional information would have been provided by an intoxication expert.  The record does not indicate and Petitioner does not allege that blood tests were conducted on the night of the incident.  As a result, an intoxication expert could no more that discuss the general effects of alcohol – effects that are commonly known to ordinary lay people.  *See Castillo v. Small*, 93 F. App'x 135, 137 (9th Cir. 2004) (noting that where no drug tests were performed on the defendant on the night of the arrest, a PCP expert could only testify to the general effects of PCP).  In such circumstances, the decision of counsel not to call an expert is neither deficient performance nor prejudicial within the meaning of *Strickland*.  *Id.* (where no specific evidence of defendant's intoxication was available for analysis, failure to call intoxication expert met neither prong of the *Strickland* standard).  *See also Noe v. Anderson*, No. 95-60803, 1997 WL 33340, at *5 (5th Cir. Jan. 6, 1997) (finding counsel's failure to call expert witness about effect of drugs not ineffective as expert's evidence would be cumulative to that of other witnesses who testified about drug-intoxicated condition of witnesses).

In sum, Petitioner's claims that trial counsel was ineffective are without merit.

IX.    <u>Ground 9:  Ineffective Assistance of Appellate Counsel</u>

- 65 -

Petitioner's final ground for habeas relief is entirely dependent on his underlying claims of trial error.  As I previously have concluded, all of Petitioner's other grounds for habeas relief are without merit.  As a result, appellate counsel cannot be found to be ineffective for failing to raise them on direct appeal.  *See Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where underlying claim lacks merit, counsel is not ineffective in declining to raise the issue on appeal).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  June 9, 2008                                    /s/ Hugh W. Brenneman, Jr.
                                                        HUGH W. BRENNEMAN, JR.
                                                        United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).